Brett W. Johnson (#021527)
Colin P. Ahler (#023879)
Derek C. Flint (#034392)
Michael A. Calvanico (#034884)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: bwjohnson@swlaw.com
         cahler@swlaw.com
         dflint@swlaw.com
         mcalvanico@swlaw.com

Anni L. Foster (#023643)
General Counsel
Office of Arizona Governor Douglas A. Ducey
1700 West Washington Street
Phoenix, Arizona 85007
Telephone: 602-542-4331
E-Mail: afoster@az.gov

*Attorneys for Defendant Douglas A. Ducey,
Governor of the State of Arizona*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Xponential Fitness LLC, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>The State of Arizona and Douglas A. Ducey, Governor of the State of Arizona, in his official capacity,<br><br>Defendants. | No. 2:20-CV-01310-DJH<br><br>**DEFENDANT'S RESPONSE TO PLAINTIFF'S VERIFIED APPLICATION FOR A TEMPORARY RESTRAINING ORDER WITH NOTICE AND MOTION FOR PERMANENT AND PRELIMINARY INJUNCTION**<br><br>Assigned to: Hon. Diane J. Humetewa<br><br>Hearing Set: July 13, 2020 at 10:00 a.m. |

## I. Introduction

"As all are painfully aware, our nation faces a public health emergency caused by the exponential spread of [2019 novel Coronavirus ("COVID-19")] . . . ." *In re Abbott*, 954 F.3d 772, 779 (5th Cir. 2020). "At this time, there is no known cure [for COVID-19], no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Mem.) (Roberts, C.J.).

From early May, when U.S. District Court of Arizona Chief Judge Murray Snow first addressed a challenge to the State of Arizona's response to COVID-19 in *McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2308479, at *4 (D. Ariz. May 8, 2020), to now, the number of positive COVID-19 cases in Arizona have increased by approximately *1,117%* and the death-toll of Arizonans due to COVID-19 has increased by approximately *442%*.[1] The most significant increase has been in the age group of 20-44, the demographic of individuals who are known to frequent fitness facilities. The circumstances in Arizona have thus required Governor Ducey to exercise the inherent and plenary police power of the State, which "undeniably includes the authority to effectuate rules to protect public health and safety." *McGhee,* 2020 WL 2308479, at *4.

Against this backdrop, on June 29, 2020, upon the guidance and recommendation of the State's most recognized medical experts on COVID-19, Governor Ducey issued Executive Order ("EO") 2020-43, titled "Pausing of Arizona's Reopening: *Slowing the Spread of COVID-19*." Among other things, the order mandated a temporary pause of the operations of indoor gyms and fitness clubs and centers (collectively, "Gyms") until at least July 27, 2020. Shortly after, Plaintiffs filed suit.

The central theme of Plaintiffs' Motion is their assertion, based on the formulaic declarations of franchisor executives and a doctor based in Oregon, that the implementation of protocols at their franchisees' Gyms effectively eliminates any meaningful threat of

---

[1] On a nationwide basis, the Center for Disease Control and Prevention ("CDC") reports 2.9 million COVID-19 cases and over 130,000 American deaths, as of July 7, 2020.

COVID-19 transmission and makes them safer than other types of businesses, and that it is irrational for anyone to believe otherwise. Although Plaintiffs may honestly believe that to be true, the State's top public health experts disagree. What's more, Plaintiffs' assertions are contradicted by their own liability waivers, which inform patrons that "you may be putting you, your guests and/or your family at increased risk for contracting coronavirus," "the risks posed by coronavirus remain," "we cannot guarantee that one of our members will not become ill with coronavirus," and that "you assume all risk and liability associated with coronavirus infection." (Doc. 21-2 at 25; Doc. 21-4 at 112.) In this public health crisis, where the State must exercise at least as much caution as Plaintiffs do in exempting themselves from liability, Governor Ducey has rationally acted on the advice of public health experts in order to protect lives and ensure that hospital beds remain available.

This is the fifth case, in either federal or state court, attempting to challenge Governor Ducey's authority to work towards the safekeeping of all Arizonans during an unprecedented crisis responding to the 2019 novel Coronavirus ("COVID-19"). In none of these cases has a court deemed it appropriate to enjoin an emergency executive order. The Plaintiffs here—who notably fail to address *any* of the cases dealing with constitutional challenges to various state governments' COVID-19 responses, whether in Arizona or elsewhere—fail to justify such extraordinary relief in this case.

## II. **Factual Background**

Governor Ducey's Motion to Dismiss (Doc. 37) and Motion for Judicial Notice (Doc. 36) both describe the undisputed relevant facts to this matter and are incorporated herein. As detailed in the Motion to Dismiss, this Court may dispose of Plaintiffs' claims based on the allegations of the Complaint and judicially-noticeable facts. Nevertheless, to provide a more complete picture regarding COVID-19 and Governor Ducey's actions in response to the virus, attached as Exhibit A is a declaration from Dr. Cara Christ, Director of the Arizona Department of Health Services ("ADHS"), Exhibit B is a declaration from Dr. Marjorie Bessel, Chief Clinical Officer for Banner Health, and Exhibit C is a declaration from Jessica Rigler, also from ADHS. These declarations primarily discuss: (1) background

1  characteristics regarding COVID-19; (2) the increase in COVID-19 cases in Arizona and
2  the associated impact on hospital beds; and (3) the specific threats of COVID-19 spread in
3  indoor gym facilities, and the associated reasoning for EO 2020-43. Furthermore, Exhibit
4  D is the declaration of Major General Michael McGuire, the Adjutant General of the
5  Arizona National Guard, and Exhibit E is the declaration Sandra Watson, the CEO of the
6  Arizona Commerce Authority, attesting to the emergency actions and governmental
7  economic incentives to assist in responding to the COVID-19 crisis.[2]

**COVID-19 Characteristics.** Because COVID-19 is highly infectious and can be fatal it poses a severe threat to individual health, especially those individuals over the age of 65. (Ex. A at ¶¶ 8-9, 24.) The virus is mainly transmitted via large respiratory droplets, including during coughing and sneezing, but also during normal activities such as singing or heavy breathing while exercising. (Ex. B at ¶ 9.) It may also be possible to contract COVID-19 by touching a surface or object that has the virus on it. (Ex. A at ¶ 10.) The CDC recommends that individuals stay six feet apart and avoid large gatherings. (Ex. B at ¶ 10.)

**COVID-19 Trends and Impacts on Medical Resources.** The virus is widespread and growing fast; it is in every Arizona county. (Ex. A at ¶ 26.) Since fitness centers were allowed to reopen on May 13, Arizona has seen a sharp increase in the number of new COVID-19 cases reported each day. (*Id.* at ¶¶ 21-23.) In the weeks before and after May 13, the number of new cases typically ranged between 400 and 500. (*Id.* at ¶ 23) On July 1, 2020, Arizona set a record for newly reported cases, which was one of several grim records set in June and July. (*Id.*) Arizona is also now hitting a daily record of hospitalizations self-reported by hospitals. (*See id.*; *see also* Doc. 36 at ¶1) During the month of June, there were only two days where the number of COVID-19 cases were less than 1,000. (Ex. A at ¶ 23; *see also* Doc. 36 at ¶1) Data shows that the spread of COVID-19 is greatest among the demographic 20-44 year-olds. (Ex. C at ¶ 16.) In the month of June 2020, 53% of all COVID-19 cases reported in Arizona were in 20-44 year-olds. (*Id.*)

---

[2] The declarations of Dr. Christ, Ms. Rigler, Ms. Watson, and MG McGuire were also utilized in *McGhee and Mountainside Fitness v. Ducey* (Doc. 36 at ¶ 38).

- 3 -

As a result of the increase in cases, ADHS reports that hospital capacity is being increasingly challenged, with *85%* of hospital beds and *91%* of ICU beds full as of July 8, 2020. (Doc. 36 at ¶ 5.) The recent surge of COVID-19 cases, coupled with the limited remaining availability of intensive care unit and inpatient hospital beds, threatens to compound the problem of addressing a pandemic without adequate resources. (Ex. A at ¶ 35, Ex. D at ¶¶ 17-19.) Arizona hospitals have also been forced to make difficult decisions to limit visitors, cease many "elective" surgeries that are often critical to patients' treatment, and transfer patients in order to properly allocate scarce resources and protect the health and safety of patients and health care workers. (Ex. B at ¶¶ 7, 14, 15.)

**Threats Associated with Gyms**. Gyms are high-risk facilities because of the nature of exercise, which is not conducive to mask wearing and contact with bodily fluids (*i.e.*, sweat). (Ex. A at ¶ 29; Ex. B at ¶¶ 17-19.) Exercising results in heavier breathing than normal and increases respiratory droplet secretions into the environment. (*Id.*) The respiratory droplets are then more easily spread due to the limited ventilation, turbulent airflow patterns, and warm, indoor environment of Gyms. (*Id.*) In a Gym setting, social distancing is difficult and contact with the bodily fluids of others is inevitable. (Ex. B at ¶ 24.) Moreover, the nature of Gyms makes management of COVID-19 difficult given the tendency to regularly go to different areas of a facility, use multiple machines, enter and exit locker rooms/restrooms, and travel to and from water fountains throughout a visit. (Ex. A at ¶ 31.) Even if Gyms follow strict cleaning protocols, there is still a risk because certain items cannot be clean, sanitized, or disinfected between uses. (Ex. B at ¶ 24.) Unlike other types of businesses, such as grocery stores or restaurants, Gym members return multiple times per week as part of a fitness routine. (*Id.* at ¶ 19.) Gyms also cannot be easily compared to retail, food, or general office environments because of the fundamentally different activities that take place in Gyms. (Ex. A. at ¶ 32.) Additionally, 20-44 year-olds are the largest demographic to frequent Gyms. (Ex. C at ¶ 26.)

**Governor Ducey's Executive Orders**. On May 12, 2020, as part of EO 2020-36, Governor Ducey ordered that ADHS provide guidance as to the re-opening of Gyms. (Doc.

22-2 at 1-7.) ADHS made clear that this guidance was subject to change, such as due to a change in the trajectory of COVID-19. (*Id.* at 7.) Even with the significant efforts and sacrifices, there is still "community spread," which means the COVID-19 is being transmitted in Arizona without any known contact with a sick person and the number of cases has grown. (Ex. A at ¶ 33.) Governor Ducey thus made the determination to issue EO 2020-43, which, among other things, paused operations of high-risk businesses until at least July 27, 2020. (Doc. 21-2 at 18.) Without the Governor's order scaling back the reopening of certain businesses that pose a higher risk, Arizona will face an even larger increase in COVID-19, which will put more strain on Arizona's healthcare system. (Ex. A at ¶ 33.)

**Economic Resources Available to Businesses**. The necessary restrictions required by COVID-19 have been offset by the significant efforts of government agencies in financially assisting businesses. (Ex. E at ¶ 10.) The two rounds of the federal CARES Act allocated $659 billion for small businesses, with over $8.5 billion already approved for over 63,000 small businesses in Arizona. (*Id*. at ¶ 11.) Under the CARES Act, qualifying small businesses can also apply for "Paycheck Protection Program" loans. (*Id*. at ¶ 12.) These loans can fund up to eight weeks of payroll costs and are fully forgiven if used for maintaining or rehiring workers, rent, mortgage interest, or utilities. (*Id*.) In addition, the U.S. Small Business Administration approved an Economic Injury Disaster Loan ("EIDL") declaration for Arizona, which allows small businesses to apply for additional funding. (*Id*. at ¶ 13.)[3] Just last week, the United States Senate approved an extension to the Paycheck Protection Act, which provides forgivable business loans.[4] If COVID-19 is not effectively contained, Arizona's economy will be even more significantly impacted than is already the case, with the loss of businesses and employment exponentially higher. (Ex. E at ¶ 17.) Plaintiffs do not reference whether it or, more importantly, its franchisees have taken advantage of these programs to minimize the economic impact on their business activities.

---

[3] *See also* Ex. F (*Main Street Program*, United States Federal Reserve (July 8, 2020), (detailing loan eligibility for companies with less than $5 billion in revenue)).
[4] *See Trump Signs Small Business Loan Program Extension*, (attached as Exhibit G).

- 5 -

## II. Argument

The legal standards for obtaining a TRO and a preliminary injunction are essentially the same. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). Here, Plaintiffs cannot satisfy any of the four *Winter* factors for a TRO or preliminary injunction.

### A. Plaintiffs Are Highly Unlikely to Succeed on the Merits.

#### 1. The Procedural Due Process Challenge to EO 2020-43 Fails.[5]

Plaintiffs' procedural due process claims, under the federal and state constitutions, are both premised on the mistaken assumption that Governor Ducey's issuance of this order somehow conferred Plaintiffs with a right to individualized notice, an individualized hearing, or other procedural rights. This assumption is incorrect for at least two reasons.

*First*, the activity of "operating a business" is not a constitutionally protected property interest. *See Talleywhacker, Inc. v. Cooper*, 2020 WL 3051207, *12 (E.D.N.C. June 8, 2020); *see also Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). The deprivation of a protected interest is an essential element of a procedural due process claim. *See Brewster*, 149 F.3d 971, 982 (9th Cir. 1998); (*see also* Doc. 37 at 4-5).

*Second,* because EO 2020-43 is a generally applicable order that did not target Plaintiffs specifically, the order was not adjudicatory and did not give rise to procedural due process protections. *See Best Supplement Guide*, 2020 WL 2615022, at *5; *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *8 (S.D. Ohio Apr. 21, 2020). Plaintiffs concede that EO 2020-43 involves a blanket temporary prohibition. (*See* Doc. 21 at 4.)

---

[5] The "Equal Protection and the Due Process Clauses of the [Arizona] and federal constitutions are construed similarly." *State v. Russo*, 196 P.3d 826, 827 (Ariz. Ct. App. 2008); *see also Vong v. Aune*, 328 P.3d 1057, 1061 (Ariz. Ct. App. 2014). Plaintiffs' federal and state constitutional claims are thus evaluated together and fail for the same reasons.

1       However, even if EO 2020-43 did give Plaintiffs any procedural due process rights, the order's attestation process to re-open on July 27 is adequate. (*See* Doc. 21 at 4-5.) Given the exigencies of this emergency, Governor Ducey had no obligation to provide any "pre-deprivation process." *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1406 (9th Cir. 1989), *overruled on other grounds by Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996); *Friends of DeVito v. Wolf*, 227 A.3d 872, 899-900 (Pa. 2020) (holding that business closure order related to COVID-19 did not require pre-deprivation process). The "Supreme Court has affirmed 'that summary governmental action taken in emergencies and designed to protect the public health, safety and general welfare does not violate due process.'" *McGhee*, 2020 WL 2308479, at *4 (emphasis added); (*see also* Doc. 37 at 7-8); (Doc. 36 at ¶ 38 (Order in *Mountainside Fitness v. Ducey*).) Of note, Plaintiffs do not even address *Sinaloa Lake* or *McGhee*.

      For their argument that pre-deprivation process is required, Plaintiffs instead rely on cases such as *Chicanos Por La Causa, Inc. v. Napolitano,* 558 F.3d 856, 867 (9th Cir. 2009) for the proposition that "employers should be given an opportunity to be heard before their business licenses are suspended or revoked." (*See* Doc. 21 at 7-8.) But these cases do not address the emergency situation that Arizona now faces. Plaintiffs' only mention of an emergency situation is the general statement in *In re Kazas,* 22 Cal. App. 2d 162, 167 (1937) that "[e]mergency does not create power." (*See* Doc. 21 at 8.) To the extent *Kazas* has any applicability, it also explained that "emergency may furnish the occasion for the exercise of power." *Kazas*, 22 Cal. App. 2d at 167. Arizona's response to COVID-19 calls for exactly that. Because the COVID-19 crisis requires quick, decisive action, and delay might cost lives or cause more stress on hospital resources, it is simply not realistic to provide every business affected by EO 2020-43 the right to an individualized hearing before taking action. *See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, --- F.3d. ----, 2020 WL 3468281, at *4 (6th Cir. June 24, 2020) ("Crises like COVID-19 can call for quick, decisive measures to save lives. Yet those measures can have extreme costs—costs that often are not borne evenly. The decision to impose those costs rests with the political branches of the

government . . . .").

Plaintiffs also argue that they should be provided with a *post*-deprivation procedure to "challenge the application of the Order to their facilities" by "demonstrat[ing] that Plaintiffs' studios in particular have sufficiently mitigated the risk of spread." (Doc. 21 at 12.) Such a waiver process is not required, however, when the Governor has made the policy decision to order a *blanket* pause on all Gyms operations, rather than taking on the onerous and resource-heavy administrative burden of making case-by-case determinations of which Gyms can operate safely in the middle of a pandemic. *See Benner v. Wolf*, 2020 WL 2564920, at *5 (M.D. Pa. May 21, 2020). This policy choice is within the Governor's discretion, especially in a recognized state of emergency. *See In re Abbott*, 954 F.3d at 784.

### 2. The Substantive Due Process and Equal Protection Challenges to EO 2020-43 Fail.

Plaintiffs seem to concede that rational basis review applies to both its substantive due process and equal protection claims. (*See* Doc. 21 at 13, 16.) This highly deferential standard controls because EO 2020-43 does not infringe on any fundamental right or involve any suspect classification. *See, e.g.*, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). The rational basis standard imposes the burden on Plaintiffs to show that there is no "reasonably conceivable state of facts that could provide a rational basis" for the EO 2020-43. *Id.* This analysis "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 315.

As discussed in the Motion to Dismiss, the Court can determine that EO 2020-43 passes rational basis review based on Plaintiffs' own allegations and judicially-noticeable facts. (*See* Doc. 37 at 8-11.) The CDC has reported that COVID-19 transmits person-to-person via respiratory droplets. (Doc. 36 at ¶ 19.) It is a matter of common sense that Gyms are places where individuals congregate and engage in high-exertion physical activities that cause them to breathe more heavily. Moreover, prior to EO 2020-43, the CDC published preliminary findings in a study on the transmission of COVID-19 through fitness classes. (*Id.*) Before issuing the order, Governor Ducey also had access to ADHS data on the sharp

- 8 -

rise of COVID-19 cases in Arizona and the decreasing age of infected individuals (particularly in the 20-44 age range). Indeed, EO 2020-43 specifically cited Arizona's COVID-19 data as a basis for the order, and further stated that "there has not been sufficient time for mask mandates and limiting groups to have a demonstrable effect." (Doc. 22-2 at 17.) EO 2020-43 is also, on its face, a *temporary* restriction that can be rolled back by Governor Ducey as more data becomes available.

To the extent necessary to decide Plaintiffs' request for a TRO, the attached declarations of Dr. Christ, Dr. Bessel, and Ms. Rigler provide additional, factual support for the genuine relationship between EO 2020-43 and the COVID-19 crisis. For instance, Dr. Christ states that Gyms create a uniquely dangerous environment for the spread of COVID-19 because exercise makes mask-wearing more difficult and less effective, and individuals emit more virus-spreading respiratory droplets during exercise. (Ex. A at ¶ 29.) Similarly, Dr. Bessel states that exercise is not conducive to wearing a mask, results in heavier breathing, and increases respiratory droplet secretions into the environment. (Ex. B at ¶ 17.) Even if Gyms follow cleaning protocols, there is still a risk because certain items cannot be cleaned, sanitized, or disinfected between uses. (*Id.* at ¶ 24.) Plaintiffs continually compare themselves to casinos, but that analogy is misplaced when casinos are not associated with strenuous physical activities and the associated heaving breathing.

The above information from CDC, ADHS, and the State's top public health experts directly contradicts Plaintiffs' assertions that EO 2020-43 was not supported by "evidence" or that Governor Ducey had no basis to conclude that Gyms posed a different risk of COVID-19 transmission than other types of businesses not included within the order. (Doc. 21 at 13-14.) Regardless, Governor Ducey did not need "evidence" or to fully articulate his reasoning in the actual order. A rational basis may involve speculation, and need not even be the actual motivation for the decision. *See Beach Commc'ns, Inc.*, 508 U.S. at 315 (explaining that the government's decision not to explain its reasoning on the record "has no significance in rational-basis analysis").

At bottom, Plaintiffs' argument reflects a disagreement with the *sufficiency* of the

- 9 -

evidence relied on by Governor Ducey, with Plaintiffs asserting that the Governor needed "evidence" to support a distinction between Gyms and other businesses that have remained open, such as reported incidents of COVID-19 transmission at the specific facilities of Plaintiffs' franchisees. (Doc. 21 at 13-14.) Rational basis review requires no such thing. *See Beach Commc'ns, Inc.*, 508 U.S. at 315; *see also Talleywhacker*, 2020 WL 3051207, at *10-11 (rejecting argument that "similarities between [plaintiffs' businesses and those allowed to reopen]" meant the closure order failed to meet rational basis test). Nor does it make sense to condition the Governor's emergency power on identifying specific COVID-19 cases, when community spread is rampant in Arizona and quick, decisive action is required. (Ex. A at ¶ 33.) In any event, Dr. Bessel's declaration confirms that there have been reports of Gyms being the source of COVID-19 transmission. (Ex. B at ¶ 22.)

Moreover, Plaintiffs' own declarations and attached exhibits undercut their own argument that their franchisees' Gyms present no meaningful risk in spreading COVID-19. Plaintiff AKT has a coronavirus liability waiver, which informs patrons "that by accessing the studio, *you may be putting you, your guests and/or your family at increased risk for contracting coronavirus.*" (Doc. 21-2 at 25 (emphasis added).) Plaintiff YogaSix notifies customers that "the risks posed by coronavirus remain," "we cannot guarantee that one of our members will not become ill with coronavirus," and "you assume all risk and liability associated with coronavirus infection." (Doc. 21-4 at 112; *see also* Doc. 21-2 at 99.)[6]

Plaintiffs attach a declaration from Dr. Kevin Winthrop, who suggests that other measures *could be* "more effective" in slowing the spread than closing Gyms. (*See* Doc. 21-5 at ¶ 19.) This is matter of policy, however, and it has no relevance to rational basis review. *See Whitmer*, 2020 WL 34682821, at *3 ("[T]he Governor's order need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19" to withstand rational basis scrutiny but instead need only be supported by a "conceivable"

---

[6] The exhibits to Plaintiffs' declarations also indicate that franchisee staff members are not required to wear face coverings at all times, and that "[a] studio needs proof of a confirmed positive COVID-19 test to move forward with any temporary closure precautions." (*See, e.g.*, Doc. 21-4 at 63, 88.)

set of facts). Moreover, Dr. Winthrop's declaration fails to consider critical pieces of evidence, including the CDC's study on fitness classes. (*See* Doc. 36 at ¶ 19.) In speaking to the media, Dr. Winthrop has also conceded that due to social distancing and "environmental factors like wind and UV (radiation)," (Ex. H), any kind of indoor activity poses a greater risk of contracting COVID-19, including "[a]ny setting where there's lots of people that are touching things frequently." (Ex. I.) What's more, Dr. Bessel (who is more knowledgeable than Dr. Winthrop regarding the specific health exigencies in Arizona) disagrees with Dr. Winthrop's conclusions for various reasons, including that mask mandates alone are not enough, and that gyms are still high-risk environments even if compliance with government guidance. (Ex. B at ¶¶ 25-26.) Dr. Bessel has thus concluded that closing Gyms is a "prudent way to mitigate the risk of furthering the spread of COVID-19." (*Id.* at ¶ 27.)

Just yesterday, an Arizona state court refused to issue a TRO enjoining EO 2020-43, concluding the plaintiff Gyms in that case were unlikely to succeed on substantive due process or equal protection grounds, and that "[t]he Governor is not required to back his decision with precise scientific data, particularly when it does not exist." (Doc. 36 at ¶ 38.) Other courts have similarly refused to enjoin other state orders temporarily restricting the operations of indoor gyms. *See League of Indep. Fitness Facilities & Trainers*, 2020 WL 3468281, at *3 ("The idea that heavy breathing and sweating in an enclosed space containing many shared surfaces creates conditions likely to spread the virus is a paradigmatic example of 'rational speculation' that fairly supports the Governor's treatment of indoor fitness facilities."); *Best Supplement Guide*, 2020 WL 2615022, at *7-9 (refusing to enjoin COVID-19 restrictions that were "temporary, rooted in science, and proportional to the threat COVID-19 poses.").

Of note, Plaintiff YogaSix has asserted that its "'coronavirus rules' …may be revised by us at any time." (Doc. 21-4 at 111.) Governor Ducey must have that same discretion in a public health crisis to modify the "rules" in response to the ongoing advice from medical experts. Regardless of whether the Gym protocols issued in May were considered sufficient

back in May, times have changed. (Doc. 36 at ¶ 38 ("Consistency, however, is not required to pass the rational basis test, particularly during times when the available information is constantly changing."))

### 3. Plaintiffs Takings Claim Cannot Support an Injunction.

Plaintiffs' takings claims will fail because, among other things, they cannot identify any constitutionally protected property interest and complain about non-compensable, indirect alleged harms. (*See* Doc. 37 at 11-12.) Regardless of the merits of this claim, however, the claim cannot support the entry of a TRO or preliminary injunction. "As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2179 (2019). Plaintiffs do not appear to allege that compensation is not available as a remedy in this case. Instead, damages are one of the specific remedies they seek. (*See* Doc 1. at 19.)

### 4. Plaintiffs' Contracts Clause Challenge Fails.

Plaintiffs cannot meet either element of a Contract Clause claim: (1) that EO 2020-43 *substantially* impairs their contractual relationships; or (2) that the order was not drawn in a "reasonable way to advance a significant and legitimate public purpose." (*See* Doc. 21 at 18.); *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). "The Clause is 'narrowly construe[d]' in order 'to ensure that local governments can effectively exercise their police powers.'" *Ballinger v. City of Oakland*, 398 F.Supp.3d 560, 576 (N.D. Cal. 2019) (quoting *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

A substantial impairment is a severe, immediate and permanent change to a contractual relationship. *See Schmid v. Sonoma Clean Power*, 2014 WL 12689941 at *5 (N.D. Cal. 2014) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). On its face, EO 2020-43 is temporary, lasting for approximately a month, unless extended. (Doc. 22-2 at 18.)

The facts described above (as well as the attached declarations) also show that EO 2040 is a reasonable way to combat the spread of COVID-19 in the middle of a surge of cases in Arizona. The Contract Clause does not trump the police power of a state to protect

- 12 -

the general welfare of its citizens. *See Buffalo Teachers Fed'n v. Tobe*, 464 F. 3d 362, 367 (2d Cir. 2006) (quoting *Allied Structural Steel*, 438 U.S. at 240). Plaintiffs fail to address how courts have actually addressed Contract Clause cases in emergency situations. In such situations, the State's police power is extraordinarily broad and certainly encompasses a public health measure like EO 2020-43. *See McGhee*, 2020 WL 2308479, at *4.

### 5. The Challenge to EO 2020-43 as Unconstitutionally Vague Fails.

Plaintiffs' void-for-vagueness challenge to EO 2020-43 fails for at least two reasons: (1) Plaintiffs do not have any grounds to raise a facial or an as-applied challenge to the order; and (2) the order plainly applies to Plaintiffs (as illustrated by their voluntary closure) and unambiguously sets forth the prohibited conduct and its duration.

On the first issue, because EO 2020-43 does not "chill" First Amendment activities, Plaintiffs do not have grounds to assert a facial challenge to the order. *See United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001). They also have no basis to assert an as-applied challenge, which only arises when the government actually seeks to enforce a vague statute (or order) against a person or entity and impose the associated criminal or civil penalties. *See Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349-50 (11th Cir. 2011). Here, Plaintiffs are not being (and have not been) prosecuted or fined as a result of EO 2020-43. Nor have Plaintiffs identified any risk of future prosecutions: Plaintiffs are franchisors that do not actually operate fitness centers in Arizona. (*See* Doc. 1 at ¶¶ 17-24, 91.) Moreover, each Plaintiff has confirmed that its franchises are currently in-compliance with the EO's directives. (*See* Doc. 21-2 at 7, 14-15, 51-52, 91; Doc. 21-3 at 6; Doc. 21-4 at 7, 70, 96-97.) Thus, Plaintiffs have no grounds to assert an as-applied challenge.

Even if Plaintiffs had any basis to bring a vagueness challenge, EO 2020-43 provides a comprehensible standard that gives fair warning of the proscribed conduct. (*See* Doc. 22-2 at 18.) Individuals of ordinary intelligence are capable of identifying what constitutes an "indoor gym or a fitness club and center," as these are ordinary terms with a common sense meaning. *See United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014). Indeed, Plaintiffs recognize themselves as franchisors of fitness brands and fitness studios and, thus, cannot

- 13 -

show that EO 2020-43 is ambiguous as applied *to them*. (*See* Doc. 21-2 at 4, 12, 49, 88; Doc. 21-3 at 3; Doc. 21-4 at 4, 67, 94); *see Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982) (as-applied challenge does not consider potential ambiguity as to non-parties). Moreover, Plaintiffs also acknowledge their comprehension of the conduct proscribed in the EO—that their franchisees' pause operations—because they have asserted that their franchises are in fact closed. (*See* Doc. 21-2 at 7, 14-15, 51-52, 91; Doc. 21-3 at 6; Doc. 21-4 at 7, 70, 96.)[7] If the order is extended, that order will provide notice of any modified date for resuming operations.[8]

The procedures for re-opening are not within the scope of the void-for-vagueness doctrine because such procedures do not involve the proscription of conduct. *See Woodruff v. Dep't of Labor*, 954 F.2d 634, 642 (11th Cir. 1992). Regardless, by describing an attestation process, EO 2020-43 gives Plaintiffs fair warning that Gyms must submit to obtain authorization to re-open on July 27. *See Rowan v. United States Post Office Dep't*, 397 U.S. 728, 740 (1970) (regulations are unconstitutionally vague "only when [they] expose[] a potential act to some risk or detriment without giving him fair warning of the nature of the proscribed conduct."). For these reasons, Plaintiffs' vagueness argument fails.

### B. Plaintiffs Cannot Show a Likelihood of Irreparable Harm.

To obtain a preliminary injunction or TRO, a party must show that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter,* 555 U.S. at 20. The general rule that an alleged constitutional infringement meets the irreparable harm requirement is only applicable in cases where the plaintiff shows a likelihood of success on the merits. *See, e.g.*, *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) ("Because the district court's assessment that Rendish did not show a likelihood of success was accurate, it did not abuse its discretion in finding no irreparable harm based on a loss of her constitutional rights."). Moreover, "economic harms are generally insufficient to

---

[7] Plaintiff Pure Barre sent an inquiry to the State as to whether its franchises are covered by the order, and received confirmation that it did within one day. (Doc 21-3 at 81-82.)

[8] By comparison, an evacuation order pursuant to a natural disaster could not have a specific timeframe for return, as this would be unrealistic and unreasonable.

- 14 -

show irreparable harm in the context of such extraordinary [COVID-19-related] emergency relief." *Benner*, 2020 WL 2564920, at *9. Speculative injury is also insufficient to establish irreparable harm. *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). "[U]nsupported and conclusory statements" that lack detail are likewise insufficient. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (conclusory affidavits signed by company executives are insufficient to establish irreparable harm).

Here, the declarations of company executives on which Plaintiffs rely primarily on economic harms, which are not irreparable. (*See, e.g.*, Doc. 21-2 at 7.) Though Plaintiffs' sacrifice for the sake of public health is unfortunate, this harm is not irreparable because it could be remedied by money damages, as demonstrated by Plaintiffs' decision to assert a takings claim. *See Nat'l Football League*, 634 F.2d at 1201. Moreover, in alleging financial harm, Plaintiffs have failed to address the significant governmental economic assistance available to companies during the COVID-19 crisis and do not discuss how such relief applies to them or their franchisees. For example, as part of the federal CARES Act, small businesses can apply for Paycheck Protection Program loans, which are forgivable if businesses satisfy certain conditions. (Ex. E at ¶ 12.) In addition, the U.S. Small Business Administration allows Arizona small businesses to apply for Economic Injury Disaster Loans to pay for capital-needs deficiencies caused by the COVID-19 response, (*Id.* at ¶ 13), and the Federal Reserve established the Main Street Lending Program to support small- and medium-sized businesses with annual revenues of $5 billion or less. (*See* Ex. F (*Main Street Lending Program*)). Plaintiffs do not discuss what efforts (if any) they or their franchisees have made to obtain these or other forms of governmental assistance.

Plaintiffs' declarations also allege a slew of other harms, including loss of goodwill, reputational harm, "loss of optimism," lost work for employees, and an increased likelihood of losing existing franchises. (*See, e.g.*, Doc. 21-2 at 8.) But none of Plaintiffs' declarations come from an actual Arizona franchisee; instead, the declarations come from corporate

executives of Plaintiff-franchisors who provide second-hand speculation as to the state of their Arizona franchisees. In addition, Plaintiffs provide no factual support for these alleged harms; they merely list each form of harm without explanation. It defies logic that Plaintiffs' reputation will be harmed by complying with a temporary closure order in the middle of a pandemic. The conclusory nature of these declarations is further evidenced by the fact that all the declarations contain *nearly identical language* that appears to be copied and pasted from one declaration to the next. (*See, e.g.*, Doc. 21-2 at 7-8, 15-16, 52-53, 91-92.) Plaintiffs have therefore failed to show that EO 2020-43 is likely to cause irreparable harm.

### C. The Balance of Hardships and Public Interest Tips Sharply in Favor of Upholding EO 2020-34.

When a government entity is a party to a lawsuit, it is appropriate to "consider the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Here, the balance of equities and the public interest tips decidedly in favor of protecting the community from a world-wide pandemic. Plaintiffs largely focus on two public interests that would allegedly be harmed by enforcement of EO 2020-43: (1) the health and well-being associated with using Gyms; and (2) the harm to the local economy effectuated by job losses due to the shutdown. (*See* Doc. 21 at 19-20.)

The first interest is tempered by the many other types of exercise activities that remain available to Arizonans. (*See* Ex. B at ¶ 21.) The second interest, while an unfortunate outcome of the pandemic, ignores that the increased spread of COVID-19 presents a threat of economic impact through the potential closure of other businesses. (*See* Ex. E at ¶ 17.)

Accordingly, the balance of equities here involves: (1) the narrow public interest in using Gyms, and the Gyms' effect on the local economy while open; and (3) on the other hand, the public interest in death and serious physical illness, maintaining an appropriate supply of hospital beds, and preventing the closure of additional businesses. (Ex. A at ¶¶ 20-21, 35.) The public interests in keeping EO 2020-43 in place are far more significant than anything that Plaintiffs have alleged or could show.

Indeed, when faced with a public health crisis like COVID-19, the public interest in state action "is at its zenith." *Abbott*, 954 F.3d at 795. "In the unprecedented circumstances now facing our society, even a minor delay in fully implementing the state's emergency measures could have major ramifications . . . ." *Id.* Accordingly, in *Abbott*, the court declined to second-guess the Texas Governor's decision-making on how to best conserve medical resources, noting: "It is hard to imagine a more urgent situation." *Id.* at 795.

Based in part on the unassailable public interest in combating the spread of a deadly disease, other courts have repeatedly determined that it would be improper to enjoin the enforcement of various state executive orders related to COVID-19. *See Friends of DeVito,* 227 A.3d at 892 ("Faced with protecting the health and lives of 12.8 million Pennsylvania citizens, we find that the impact of the closure of these businesses . . . is not unduly oppressive."); *see also* Doc. 36 at Ex. 19 (Order in *Mountainside Fitness v. Ducey*) (concluding that interest in gym remaining open was outweighed by strong interest in dealing with public health concern concerning this Executive Order).

The bottom-line is that a business's desire to continue operations and receive revenue does not outweigh the public's interest in health and well-being, particularly during a public health emergency. *See Benner*, 2020 WL 2564920, at *9 ("[W]e acknowledge that Petitioners have important financial equities at play in this case, they have failed to adduce evidence to prove that their losses outweigh the grave harms that could result to all Pennsylvanians from a widespread COVID-19 outbreak").

**IV.  Conclusion**

EO 2020-43 imposes rational restrictions that are based on expert data and guidance. It is also in line with actions taken by other states to limit the devastating impact of COVID-19. Plaintiffs cannot show that EO 2020-43 violates the U.S. or Arizona Constitutions or might cause them irreparable harm, and the public interest is overwhelming in favor of the order's continuation. Accordingly, Plaintiffs' Application should be denied.

- 17 -

DATED this 8th day of July, 2020.

                SNELL & WILMER L.L.P.

                By: s/ Brett W. Johnson
                    Brett W. Johnson
                    Colin P. Ahler
                    Derek C. Flint
                    Michael A. Calvanico
                    One Arizona Center
                    400 E. Van Buren, Suite 1900
                    Phoenix, Arizona 85004-2202

                    Office of Governor Douglas A. Ducey
                    Anni L. Foster
                    1700 West Washington Street
                    Phoenix, Arizona 85007

                    *Attorneys for Defendant Douglas A. Ducey, Governor of the State of Arizona*

**CERTIFICATE OF SERVICE**

I certify that on July 8, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, which electronically sends a copy of same on to:

Brian A. Howie
**Quarles & Brady LLP**
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391
Brian.howie@quarles.com
*Attorney for Plaintiffs*

Alex M. Weingarten
Celeste M. Brecht
Jeffrey K. Logan
Steven E. Swaney
**Venable LLP**
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
amweingarten@venable.com
cmbrecht@venable.com
jklogan@venable.com
seswaney@venable.com
*Attorneys for Plaintiffs*

 s/ Tracy Hobbs